CONSOLIDATED KANSAS CITY SMELTING & REFINING CO. v. DILL.*
(No. 592.)

(Court of Civil Appeals of Texas. El Paso. June 16, 1916. Rehearing Denied Oct. 5, 1916.)

1. MASTER AND SERVANT ⬅286(3)—INJURIES TO SERVANT—QUESTIONS FOR JURY.
    Evidence *held* to warrant submission to jury of question whether employer's foreman ordered servant to work in furnace while it was hot, and dangerous owing to extreme heat.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1010; Dec. Dig. ⬅286(3).]

2. MASTER AND SERVANT ⬅286(3, 24)—INJURIES TO SERVANT—QUESTIONS FOR JURY.
    It is for the jury whether a furnace was in safe condition in which to work, plaintiff having been injured while working therein, and also whether it was the foreman's duty to inspect the furnace and determine whether it was safe.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1010, 1029; Dec. Dig. ⬅286(3, 24).]

3. MASTER AND SERVANT ⬅235(4)—INJURIES TO SERVANT—SAFE PLACE TO WORK.
    The servant has a right to presume that a furnace in which he was put to work is a reasonably safe place to work.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 713; Dec. Dig. ⬅235(4).]

4. MASTER AND SERVANT ⬅265(5)—RES IPSA LOQUITUR—SAFE PLACE TO WORK.
    While the mere fact of injury at work is not of itself proof of negligence, yet, where the particular thing causing the injury has been shown to be under the management of the defendant, or its servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation, that the accident arose from want of care.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 898, 955; Dec. Dig. ⬅265(5).]

**5. MASTER AND SERVANT ⚖️285(5)—INJURIES TO SERVANT—QUESTIONS FOR JURY.**

Evidence *held* to warrant submission to jury of question whether impaired condition of servant's health resulted from extreme heat of furnace in which he worked.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1016; Dec. Dig. ⚖️285(5).]

**6. MASTER AND SERVANT ⚖️276(3)—INJURIES TO SERVANT—BURDEN OF PROOF.**

The rule does not require an injured servant to prove with reasonable certainty that his condition resulted from the heat of a furnace in which he alleged he worked with resultant injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 951, 959; Dec. Dig. ⚖️276(3).]

**7. MASTER AND SERVANT ⚖️289(15)—INJURIES TO SERVANT—QUESTIONS FOR JURY.**

Evidence *held* to warrant submission to jury of question of servant's contributory negligence in working in heated furnace.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1106; Dec. Dig. ⚖️289(15).]

**8. NEGLIGENCE ⚖️97—INJURIES TO SERVANT—COMPARATIVE NEGLIGENCE.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 5246h, as to comparative negligence and its effect on the servant's recovery, a servant may recover for injuries, though he is himself negligent.

[Ed Note.—For other cases, see Negligence, Cent. Dig. §§ 93, 162; Dec. Dig. ⚖️97.]

**9. MASTER AND SERVANT ⚖️264(4)—INJURIES TO SERVANT—VARIANCE.**

If servant alleges injuries due to defective furnace, in that it was extremely hot, and contained fumes and gases, proof of heat, or of fumes, or of gases, is sufficient, and the verdict for the servant need not be set aside for failure to prove all.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 865; Dec. Dig. ⚖️264(4).]

**10. MASTER AND SERVANT ⚖️278(3)—INJURIES TO SERVANT—EVIDENCE.**

Evidence *held* not to warrant saying that verdict finding that a furnace in which a servant worked was dangerous was without proof.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 958; Dec. Dig. ⚖️278(3).]

**11. DAMAGES ⚖️185(1)—INJURIES TO SERVANT—EVIDENCE—WEIGHT.**

That a servant who claimed injuries went back to work the next day would merely be an evidentiary fact going to extent of injuries.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503, 504, 508; Dec. Dig. ⚖️185(1).]

**12. DAMAGES ⚖️185(1)—INJURIES TO SERVANT—EVIDENCE.**

Evidence *held* not to warrant saying that verdict as to extent of servant's injuries was unsupported by proof.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503, 504, 508; Dec. Dig. ⚖️185(1).]

**13. DAMAGES ⚖️132(1)—INJURIES TO SERVANT—EXCESSIVE DAMAGES.**

Verdict of $8,000 to servant, who had been a strong man in good health, earning $4.25 per day, at 52 years of age, who by his injuries lost his health, suffered pain after 15 months, and became incapable of earning money, was not excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 372; Dec. Dig. ⚖️132(1).]

Appeal from District Court, El Paso County; Ballard Coldwell, Judge.

Action by T. E. Dill against the Consolidated Kansas City Smelting & Refining Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Davis & Goggin, of El Paso, for appellant. Nealon & Dorman, of El Paso, for appellee.

WALTHALL, J. This is a suit for damages for personal injuries. On or about the 9th day of May, 1914, appellee, T. E. Dill, was in the employ of appellant, Consolidated Kansas City Smelting & Refining Company, in the capacity of general carpenter. Appellant was a corporation and employs, and for several years past has employed, more than five employés. Appellee alleged that appellant caused him to enter and work in a reverberatory furnace, setting up forms therein before said furnace had been cooled after said furnace had been used, and while same was in a dangerous condition from extreme heat and the presence of dangerous fumes and gases. The negligence charged is: First, that appellee did not know of the dangerous condition of the furnace as a result of its extreme heat and the presence of dangerous fumes and gases, and that appellant failed to warn him of the danger of working therein; second, failure to furnish appellee a safe place in which to work. Appellee alleged that while working in the furnace he sustained the injuries of which he complains and some of which he alleged to be permanent, and that he suffered mental anguish.

Appellant answered by general demurrer and general denial; specially denied the alleged acts of negligence; pleaded contributory negligence, that any person of ordinary observation could see and perceive the condition of the furnace as to heat, fumes, and gases, and that, if appellee subjected himself thereto in the performance of said work and was injured, such injuries resulted through appellee's negligence.

The case was submitted to the jury on special issues, and on the jury's findings the court entered judgment for appellee for $8,000.

The issues made by the pleadings and on which evidence was offered are reflected by the questions submitted to the jury and their answers, which we here give:

"No. 1: Please answer whether or not the defendant, its agents, servants, or employés, caused the plaintiff to enter and work in a reverberatory furnace on or about May 9, 1914, setting up forms therein before said furnace had been cooled, and after said furnace had been used, and while said furnace was in a dangerous condition as a result of its extreme heat, and the presence of dangerous fumes and gases.

⚖️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Answer this question 'Yes' or 'No.'    Answer: Yes.

"No. 2: If you answer the previous question in the affirmative, then answer the following question 'Yes' or 'No': Did the defendant fail to use ordinary care to make and to have said furnace an ordinarily safe place in which to work?    Answer: Yes.

"No. 3: If you have answered the foregoing question in the affirmative, then state whether or not such failure to use such ordinary care was a proximate cause of the injury, if any, complained of in his petition.    Answer this question 'Yes' or 'No.'    Answer: Yes.

"No. 4: If you have answered the foregoing question in the affirmative, please state what sum of money, if paid in cash now, would be a reasonable compensation to plaintiff for the injuries he alleges, which he has sustained, that were proximately caused by the negligence, if any, of defendant, alleged by him.    Answer: Yes, $8,000.    In estimating the plaintiff's damage, if you find any, you may take into consideration the mental and physical pain, if any, heretofore suffered by plaintiff in consequence of his injury, if any, and his diminished capacity to labor and earn money in the future, if any. If you believe from the evidence that he will suffer mental and physical pain in the future, in consequence of his injuries, if any, you will take that into consideration in estimating his damages.    However, if you find that plaintiff himself was guilty of contributory negligence proximately causing the injuries, if any, to himself, the damages to be found by you under the foregoing part of this paragraph should be diminished in the proportion to the amount of negligence attributable to plaintiff.    In this connection you will answer the following question:

"No. 5: Was the plaintiff himself guilty of contributory negligence proximately causing or contributing to cause his injuries, if any? Answer this question 'Yes' or 'No.'    Answer: No."

In addition to the above, without stating the questions and answers formally, the jury found in answer to questions submitted by the defendant: That the plaintiff was injured on the 9th day of May, 1914, on account of going into a reverberatory furnace; that the furnace was in a dangerous condition as a result of its extreme heat; that it was in a dangerous condition as the result of the presence therein of dangerous fumes and gases; that he was injured on account of such fumes and gases; that he was caused to go into the furnace by his foreman, or some one in control; that it was defendant's duty to have warned plaintiff of the danger of working in such furnace; that plaintiff was without negligence, in that he did not know and could not have known by ordinary care of the dangerous condition of the furnace; that there were hidden or latent dangers in the furnace of which plaintiff did not know, and could not be appreciated by a person of ordinary intelligence; that the condition of the furnace as to heat and fumes was not as was ordinary in the case of such furnaces when in course of repairs; that the witness Davie did not enter the furnace before plaintiff was told to work upon it; that witness Whitmore did not enter the furnace at a time plaintiff was present in company with witness Boyd; that plaintiff did not thereafter return to the smelter and work one day; that plaintiff did not after laying off four days return and work as carpenter four days before he was discharged; in arriving at its verdict, the jury did not award damages on account of insanity nor on account of scalelike substance forming over his body, resulting from defendant's negligence; the jury awarded damages resulting from injuries to plaintiff's sight, to his back, spine, and legs; that plaintiff is incapacitated from ever resuming his vocation as a carpenter and performing manual labor; that his earning capacity is wholly destroyed.

Appellant, claiming that the evidence does not support the finding by the jury that "the furnace was in a dangerous condition as the result of its extreme heat," requested a peremptory charge in its favor and the refusal to give it is its first assigned error.

. The second assignment complains of the refusal to give a peremptory charge in appellant's favor, on the ground that the proof failed to show negligence.

T. E. Dill testified:

"I am 54 years old. * * * In May I went and did some work in one of the reverberatory furnaces putting up forms.    They used the reverberatory furnace for burning ore, I suppose. I was building forms in that furnace; I do not know exactly how many hours I worked; it was in the afternoon.    I went into the furnace in the afternoon and finished it.    A negro by the name of Boyd went into the furnace with me. * * * We went in there and put up the forms, and then we went out; it got too hot one time, and we came out and cooled off.    I threw up.    I threw up once in there, and came out and sat down and cooled off.    We went back and finished up the work.    I had never worked in that reverberatory furnace before that time, or in any of them.    There was a difference in the heat that time and other times; there was to me.    It was hotter to me, and it wasn't cleaned out as it should have been; there was ashes in it about that deep (indicating).    I did not know how hot it was in there before I went in.    The reason I happened to go in there to do that work was because Mr. Davie came over to the hospital and got me and Boyd and told us that he wanted us to go over to the furnace and put in these forms.    Mr. Davie was the foreman.    He did not tell me anything about how hot it was.    The effect the heat had on me, it just made me sick and vomit.    As to the state of my health before I went in there that time, I was all right, I thought.    I was strong and could do any kind of work and as much of it as anybody.    During the year before that I worked all the time that I wanted to.    I worked at different places in El Paso besides the smelter.    After we came out of the furnace, we sat down and rested a while, and then went to the shop.    I do not know what happened during the next two or three or four months after that. After I got sick out at the smelter, I do not know where I was at; I was in the hospital, I think.    It was the county hospital I was in. My eyesight now is very bad.    I cannot read at all.    My eyesight before this trouble occurred was so I could read.    I have attempted to work since then, but I have not been able to work; I am just weak.    I suffer every day with pains through the back and shoulders and legs.    I suffer that way daily, and I have been suffering that way ever since I got sick down there that day.    I lived in Highland Park, and before that I lived in Old Ft. Bliss.    Old Ft. Bliss is a mile, I suppose, from the smelter.    In going to and from my work when I lived at Old Ft. Bliss, I would ride on the street car, and I

would walk occasionally. I could walk it all right, but it was very seldom that I walked. When I worked at the smelter they paid me $4.25 a day; I worked seven days of the week. * * * There was ashes about that deep. * * * I could smell the ashes. * * * I didn't say a while ago that I went back and worked the next day; I don't remember. * * * There was never any insanity in my family; none of my brothers and sisters were insane. I never had any symptoms of that kind before I did this work. I know that I have not. It is not a fact that Mr. Whitemore would give a certain dimension to saw by, and I would cut off three feet instead of two, or something else. He did not complain to me that I would not saw according to his dimensions and that he would have to let me out. I do remember that they had not cleaned the ashes out of this furnace. * * * I did not know at that time of its being dangerous in there to my health. I did not know whether or not it was dangerous to go inside of the furnace to do that work. I did not know how long the fires had been out in that furnace. I did not know whose business it was to see about that and see whether the furnace was cooled. The furnace had had fire in it. It is a right smart trouble to me to remember things that happened since the day I got sick out there, when I got overheated. I have to study pretty hard to think."

Mrs. Minnie Dill, wife of plaintiff, testified in part:

"We have been married 28 years. I remember along about April or May when Mr. Dill was working at the smelter and was sick. The best I remember it was somewhere between the 1st and 10th of May, 1914. Up to that time Mr. Dill's health had been good. He was a stout man. He had never been sick to amount to anything. During the 28 years we were married he never had been confined to his bed except one time, when he had the measles. He was confined to his bed six days at that time. * * * Was not sick when he went to work for the smelter. He came home from the smelter about 6 o'clock, and his clothes were dirty and smutty, ashes all over them. The soles of his shoes were scorched. I never saw them that way before. When he came home he was unconscious. He did not know anything. * * * I observed the condition of the skin; it was red and hot all over his hands and feet. He stayed in bed all night. He didn't rest to amount to anything during the night. He was not rational in his talking. He went back to the smelter the next day, but I cannot say what he did out there. * * * He came home the next night, but he still didn't know anything. * * * He was crazy. He acted like a crazy person. He would swear and fight and was in an awful state."

The witness here detailed Dill's acts tending to show insanity. Dill was then put in jail several days, and was then sent to the county hospital, where he remained some two weeks, when he was returned to the jail. Later he was returned to the hospital, when, after some weeks, he began to improve. Mrs. Dill testified as to his health and strength at the time of the trial as compared to what it was previous to his sickness:

Said he was not able to work. "Is too weak to work. Walking affects his legs. His eyesight is not good. Had never noticed any symptoms of a weak mind or insanity before his sickness. Had done all kinds of work. Never saw his shoes scorched before the day he came from the smelter. He can't stand up very well without support. He has been that way since the time he got in that shape at the smelter

until since he came from the hospital. He would fall backwards. He would do that way at any time when he was standing on the floor. He would be stiff. We would rub him with water. He didn't have any mind."

Other witnesses testified as to his mental and physical condition after his day's work at the smelter, fixing the time early in May, 1914. The county health officer, Dr. G. N. Thomas, testified at some length as to Dill's physical and mental condition from the time he was taken to the hospital until the time of the trial. He said that:

"It is probable that his condition could have been produced by the excessive heat. * * * I have held that opinion in my treatment of him for the last couple of months. In my opinion, his condition could result from that cause. * * * The condition of his kidneys could be attributed to this heat by the effect it would have on the nerves and glands of the skin more than any other thing. The excessive heat and the shock would, in my opinion, be sufficient to make a man sick at the stomach. The fumes and smoke might result in a condition of impaired kidneys and a marked intoxication of the blood. * * * As a rule, I notice that patients who have kidney trouble have their urine examined, and that there is some local swelling. When they do have pain it is felt most commonly in the lower part of the back; the seat of it is the spinal cord."

Dr. Tuten testified:

"I went to the smelter and found these fumes and tried them to pass away the time. * * * I did not go down into the reverberatory furnaces. * * * I was trying to smell the fumes. * * * There are many poisonous fumes. If there was arsenic in the fumes, if you got enough of the arsenic, it would be poisonous. A human being could not stay in the fumes too long. It would overcome him."

Dr. Ricketts testified:

"They have a heat in there [furnaces] up to about 3,000 degrees Fahrenheit. * * * Matte is made in the reverberatory."

Dr. Urmston testified in answer to hypothetical questions that said excessive heat could have produced the condition physically and mentally.

A. W. Riegel, a carpenter employed by defendant, testified, and, among other things, said:

"I do not know how long the furnaces have to cool before they work in there. I do not know how long I have observed them being cooled. The carpenters do not look after the cooling of the furnaces; we depend on the foreman. * * * There are occasions when we would throw in the odds and ends of old planks. I think I have seen them catch on fire on one or two instances. That would be a normal condition of the floor of the furnace owing to the thickness of the floor. It would retain the heat to that extent, that strong. They do not use thermometers out there to ascertain the heat of the furnaces, to my knowledge, but they must have some way of knowing the temperature in operation. A person could not know the exact temperature unless he took the thermometer."

W. L. Davie, one of the defendant's employés and witnesses, testified in part:

"We have a general foreman out there whose duty it is to cool the furnaces down so that the man can work in them. His name is Mr. Fipps. I cannot say what he did that day."

Witness Roberts, an employé and witness for defendant, said that it was the duty of the shift boss to look after the cooling off of the furnace.

C. E. Bogel, an employé of defendant, as machine shop foreman, and a witness in its behalf, testified:

"When they want a man from my department they requisition me. * * * If he has just been there once or twice, I go with him, if he is a new man. With a new man I go at least a dozen times. I do that to be sure that they *understand what I want done and that the con-*ditions are safe. * * * The only conditions that affect is heat. * * * I simply go in myself, and if I can stand it any length of time, I think it safe for other men to go in, and if I cannot stand it, I figure it is not. * * * I would stay in myself to be certain that my workmen did not encounter any danger. * * * If the heat of the furnace is sufficient to char the soles of a man's shoes, I would say that it would not be safe enough place for him to work, if it came up suddenly. If it came up gradually, I would say it was."

[1-4] A number of witnesses testified along similar lines. We think the evidence is sufficient to justify the court in submitting to the jury the question as to whether the defendant's foreman caused Dill to work in the furnace on the 9th day of May, 1914, before the furnace had been cooled off, and while the furnace was in a dangerous condition as a result of its extreme heat. The evidence discloses that it was the duty of defendant's foreman through the shift boss to see that the furnace is sufficiently cooled, and is a safe place to work before sending men in to work. Neither the foreman nor the shift boss testified on the trial. True, Mr. Davie testified that he went into the furnace and examined it and found everything in shape to work. Ashes had been cleaned out. But these were questions to be determined by the jury, and they found the facts against appellant. The jury found that Davie did not go into the furnace before Dill was sent in to do the work. Dill had the right to presume that the furnace was reasonably safe. Witnesses say that a test by thermometer is the only way to determine the degree of heat in the furnace, and that thermometers were not used by defendant. The jury were left to determine from the circumstances following as a result of his effort to work in the furnace whether it was a reasonably safe place for him to do the work he was called to do. While it is a general rule that the mere fact that an injury occurs is not of itself proof of negligence (Trinity County Lumber Co. v. Denham, 85 Tex. 56, 19 S. W. 1012), yet it is also true that the character of the accident and the circumstances in proof attending it may be such as to lead reasonably to the belief that without negligence it would not have occurred (Washington v. Missouri, K. & T. Ry. Co. of Texas, 90 Tex. 314, 38 S. W. 764). In Railway Co. v. Suggs, 62 Tex. 323, the Supreme Court said that:

"Where the particular thing causing the injury has been shown to be under the management of the defendant or its servants, and the accident is such as, in the ordinary course of things, does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation, that the accident arose from want of care."

It seems to us that the principle announced can be applied here. The duty of cooling the furnace was with the foreman through the shift boss. If care was taken to see that the furnace was sufficiently cooled before sending Dill in to work, such result as followed Dill's effort to work in the furnace would likely not have followed in the ordinary course of things. It was not error to refuse to give the requested peremptory charges.

[5, 6] The evidence is amply sufficient to justify the submission to the jury of the question as to whether the impaired condition of appellee's health resulted from the extreme heat in the furnace, and the court was not in error in submitting that issue to the jury as complained of in the third assignment. It might be said also, that the requested charge, "plaintiff has failed to prove with reasonable certainty that his impaired condition resulted from being subjected to heat," etc., is more onerous than the rule requires.

Appellant's assignments 5 and 6 have reference to appellant's exception to the court's charge, under the Employers' Liability Act, which abolishes the defense of assumed risk and introduces the doctrine of comparative negligence and raises the question of the constitutionality of the act. Since the brief was filed, the act has been held to be constitutional by the Supreme Court in Middleton v. Texas Light & Power Co., 185 S. W. 556, not yet officially reported. The assignments are overruled.

[7, 8] The evidence was sufficient to justify the court in submitting to the jury the question of contributory negligence. Under article 5246h, Vernon's Sayles' Annotated Civil Statutes, appellee would still be entitled to recover, although guilty of negligence. It was not error to refuse to give appellant's special charge No. 4, and its sixth assignment is overruled.

[9] In their answer to the first question submitted to the jury, they found that the furnace was in a dangerous condition as a result of its extreme heat, and the presence of fumes and gases; and the answer to the second question states that ordinary care was not used by appellant to make the furnace an ordinarily safe place in which to work. Appellee moved the court to set aside the verdict on the ground that the evidence fails to show that the furnace was rendered unsafe or dangerous by the presence of fumes and gases, or that any of appellee's injuries was the result of the presence of fumes and gases in the furnace. We are of the opinion that, where the pleadings allege that the furnace was rendered unsafe as a place in which to work on account of its extreme heat, and the presence of fumes and

gases, if the proof showed that it was rendered unsafe by the presence of extreme heat, it would not be error to refuse to set aside the verdict on the ground that the proof did not show the presence also of fumes and gases, or that the injuries were caused also by the presence of fumes and gases. It seems to us that the real issue of fact sought to be established was the condition of the furnace as a place to work. Was it safe or unsafe? If unsafe, was it rendered so by any one of the causes alleged? The causes were alleged to enable the appellant to meet the proof as to any one of the three, heat, fumes, and gases. If any one of the three, of itself, and not in connection with either of the others, rendered the furnace unsafe as a place in which to work, and of itself caused the injuries to plaintiff, we think it immaterial that the other alleged causes were presented to the jury and that they made findings thereon. It is true the jury found that the heat, fumes, and gases rendered the place unsafe and caused the injuries, and they also found that the fumes and gases had the same effect.

[10] We cannot say from the evidence that the several findings are not without some proof. If the appellee received his injury from any one or more of the causes alleged, we do not believe that he should be denied a recovery because of the fact that it might be impossible to say just what injury or prorated part of an injury received is attributable to any one or more of the causes. It would seem to be a safer and better rule to consider them in determining the question, Did any one or all render the place unsafe? rather than to determine, Which one or more of the injuries received did the different causes aid in producing? The seventh assignment is overruled.

We think the evidence is sufficient to sustain the jury's finding that appellee sustained the injury to his eyesight. We need not quote the evidence. The eighth assignment, questioning this finding, is overruled.

The ninth assignment raises a similar question as to injury to appellee's spine. Appellee testified that he suffered daily with pains through his back, shoulders, and legs. Dr. Thomas, who seemed to have been treating appellee for about a year, in speaking of the pains of which appellee complained, said:

"When they do have pain, it is felt most commonly in the lower part of the back. The seat of it is in the spinal cord. The spinal cord is inside of the spine. There is nothing the matter with the plaintiff's spinal cord, more than an intoxicant. * * * A general toxima is poison of the entire system."

The ninth assignment is overruled.

[11, 12] The evidence is confusing and contradictory as to the work that plaintiff did within the first fews days after the alleged accident. We need not quote the evidence. The issue that plaintiff worked the next day after the accident would simply be an evidentiary fact going to the question of the extent of his injuries. The jury found that he did not return to work the next day, and did not return and work four days still later. The finding is supported by some evidence. But whether he returned the next day or not is practically unimportant if his injuries finally resulted in impairing his health and his ability to earn money, as the jury found that it did. Appellant's tenth, eleventh, twelfth, and thirteenth assignments claim error in the court's refusal to set aside the verdict on the ground that the verdict is without evidence on the finding that appellee's earning capacity is totally destroyed. It is true the evidence shows that appellee's condition at the time of the trial, some 15 months after the accident, was improved. Dr. Thomas said:

"His urine was bad and his heart was bad, and he developed a dropsy, what we call an anasarea of the limbs, and which under treatment greatly improved, and at the present time is a great deal better than when he was at the county hospital. His mental condition has also markedly improved."

But his improved condition, after about 15 months, possibly, might be a long way from a complete recovery. We cannot say from the evidence that the jury's finding is not supported by the proof as to the extent of the injuries.

[13] The fourteenth assignment insists that the verdict is excessive. Appellee was about 52 years of age, was earning $4.25 a day, was in good health and a strong man. If his health was destroyed, if he still suffers pain, and he is rendered incapable of earning money, the verdict is not, in our opinion, excessive.

Finding no reversible error, the case is affirmed.

---

&cong;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes